**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Julia Carreon, | |
| Plaintiff, | |
| v. | Case No. |
| Citigroup Inc., and Citigroup Global Markets, Inc., | |
| Defendants. | **Jury Trial Demanded** |

## COMPLAINT

Plaintiff Julia Carreon, by and through her attorneys, Stowell & Friedman, Ltd., hereby files this Complaint against Defendants Citigroup Inc. and Citigroup Global Markets, Inc. (together, "Citi" or "Defendants"), and states as follows[1]:

## INTRODUCTION

1.      In 1996, a group of women initiated a class action lawsuit against Citi's predecessor in *Martens v. Smith Barney*, commonly known as the "Boom Boom Room" case, after the nickname of a nightmarish basement party room of a branch office where sexual harassment against women was rampant and condoned.

2.      The class action lawsuit exposed deep-seated misogyny in the Wall Street firm, resulted in $150,000,000 for women victims, and established a diversity fund of $15,000,000 to increase representation of women and persons of color in Investment Banking, Capital Markets, and Wealth Management.

---

[1] Concurrent with this Complaint, Plaintiff will be filing a charge of discrimination with the Equal Employment Opportunity Commission and intends to amend her complaint to add claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e-1, *et seq.*, when she has exhausted her administrative remedies.

3.      Yet nearly 30 years later, the representation of women at Citi has scarcely changed, with a revolving door of women victims who crash into Citi's glass ceiling and Citi jettisons from its upper echelons.

4.      Several of the core problems identified in *Martens* have persisted at Citi—among them, Wall Street Firms have felt emboldened to discriminate and harass because they could sweep the stories of their victims under the rug by forcing them into mandatory, confidential arbitration.

5.      Though some of the industry has moved away from forced arbitration of discrimination and harassment claims, Citi has worked hard to force its employees back into the secretive world of arbitration to minimize the consequences of the discriminatory and harassing culture it has allowed to fester.

6.      Similarly, Citi has built institutions to maintain its discriminatory hierarchy to enforce the glass ceiling against high-performing women. Among them, a weaponized Human Resources department shields men who discriminate and create hostile work environments but eliminates women who speak out or reach too close to the heights of power.

7.      As a deliberate effort to maintain power, enforce gender norms and create a hostile work environment, Citi primes and encourages its employees to believe that women do not belong in the heights of power but achieved their success only through engaging in sexual relationships with high powered men.

8.      Julia Carreon was one of the victims of Citi's discriminatory culture and glass ceiling. Hired to execute a seismic transformation, she was harassed and sidelined when she succeeded because she ruffled the feathers of the all-male COOs affected by the changes.

9.      When she finally appeared to gain a champion for her work, Head of Wealth Andy Sieg, Citi's discriminatory and sexually harassing culture reduced her to being perceived as a sex object—that she could not possibly have reached those heights on her own merit, but must have been sleeping with her boss, which was untrue.

10.      With Sieg failing to refute the suspicion and sexual innuendo, Carreon was debased and humiliated, subjected to pervasive gossip and discredited because of the widespread false assumption that she was not competent but was promoted for having an affair with Sieg.

11.      And so entrenched was Citi's sexually discriminatory culture that when Human Resources investigated Citi's and Sieg's harassment, it subjected *Carreon*—not Sieg—to a misogynistic investigation into their professional relationship.

12.      This pervasive sexual harassment created a hostile work environment that robbed Carreon of power in the workplace, deprived her of her chance to shine on her own merit, and damaged her professional reputation. Others at Citi felt free to treat Carreon as worthless, incapable, and powerless because they believed that she had achieved success through an affair with Sieg rather than business acumen.

13.      After Carreon had achieved too much success and established herself as a serious contender for the inner circle of executives, Citi cut short her career through a harassment campaign condoned and at times spearheaded by Citi's weaponized Human Resources department.

14.      Thankfully, with the passage of the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act ("EFAA"), Carreon can raise her claims in the sunlight and have them fairly adjudicated and redressed through the court system.

15.    Carreon brings this action to rectify these injustices and work toward a future where the women at Citi can flourish in safety and free from a discriminatory and harassing culture.

## JURISDICTION AND VENUE

16.    Plaintiff raises a claim of discrimination under 42 U.S.C. § 1981, and this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343 and supplementary jurisdiction over state law claims under 28 U.S.C. § 1367.

17.    Additionally, Plaintiff is a citizen of Texas, and the Defendants are citizens of New York and Delaware, and the amount in controversy exceeds $75,000. The Court therefore also has jurisdiction under 28 U.S.C. § 1332.

18.    Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b). Defendant maintains its corporate headquarters and principal place of business in this District and employed Plaintiff in this District. The unlawful conduct alleged in this Complaint occurred in this District and harmed Plaintiff in this District.

19.    Under the EFAA, 9 U.S.C. § 401 *et seq.*, Plaintiff's case is filed under Federal and State law and relates to a sexual harassment dispute. It is therefore not subject to any valid or enforceable predispute arbitration clause, and any issues as to arbitrability must be determined by this Court under 9 U.S.C. § 402(b).

## PARTIES

20.    Defendant Citigroup Inc. is a publicly traded, global financial services firm and Fortune 50 company incorporated in Delaware with its principal place of business in New York. In 2024, Citigroup reported revenues of $81.1 billion and a net income of $12.7 billion.

4

21.     As part of its wealth management services, Citigroup offers securities brokerage and dealing services through its wholly owned subsidiary Citigroup Global Markets Inc., a New York corporation with its principal place of business in New York. In 2024, Citi's wealth management business ("Citi Wealth"), through divisions like the Private Bank, Wealth at Work, and Citigold, managed approximately $587 billion in client assets, and earned over $7 billion in revenues and over $1 billion in net income.[2]

22.     Plaintiff Julia Carreon is a woman who resides in and is a citizen of Texas. Citi employed Carreon as Global Head of Platform & Experiences in New York City until her constructive discharge in 2024.

## FACTUAL BACKGROUND

### Citi Has a Long History and an Ongoing Pattern or Practice of Discrimination

23.     Citi's history of discrimination stretches back decades. In 1996, a class of women brought gender discrimination claims against Citi's predecessor in a suit known as the "Boom Boom Room" case. The lawsuit recovered $150,000,000.00 for women victims and established a diversity fund of $15,000,000 to increase representation of women and persons of color in Investment Banking, Capital Markets, and Wealth Management. But nearly 30 years later, the numbers remain tellingly low, with a revolving door of victims.

24.     Citi's history of discrimination has continued apace in recent years, with new management adopting and reinforcing the discriminatory culture.

25.     In August 2025, *Bloomberg* published an exposé detailing the discriminatory misconduct of Andy Sieg, the head of Citi's wealth management group. The article details that "Sieg mocked and undermined [Ida] Liu ... one of Citigroup's most prominent female

---

[2] Citigroup Inc. 2024 Form 10-K, *available at* https://www.citigroup.com/rcs/citigpa/storage/public/10K20250221.pdf

executives, in the months before she left the bank." After Liu was pushed out of Citigroup, Sieg

reorganized so that "the private bank is now run by four male regional co-heads who report to

Sieg."[3]

26.    In recent years, Citi has unleashed a torrent of discriminatory job moves, pushing

high-ranking women out and replacing them with men. Plaintiff is aware of at least a dozen high-

level women who were pushed out of Citi in just the last few years, including Liu and herself.

***Citi Hires Carreon, a Digital Strategy and Execution Professional with an Established Career
at Wells Fargo, to Fix Its Bottom-of-the-Industry Consumer Digital Experience***

27.    Plaintiff Julia Carreon has built a long and successful career developing and

executing digital platform strategy in the financial services industry. Carreon worked as the

Chief Digital and Fiduciary Operations Officer of Wells Fargo Private Bank for more than 15

years, where she developed a strong professional reputation for transforming the client's digital

experience. Among other projects, Carreon was part of a core team at Wells Fargo that built the

entire Private Bank client experience across all channels, meaning that high-net-worth clients

could experience the same special handling online and over the phone as they do in person at a

branch. Carreon excelled as a leader, managing over 500 employees across 13 states with a $90

million operating budget.

28.    Carreon earned industry recognition for delivering digital transformation at scale.

The vast majority of such transformations in the industry fail, but Carreon achieved an

immaculate zero-fail rate, which boosted her exceptional reputation. And she maintained that

rate despite working on large and highly complicated digital transformations. In 2008, for

---

[3] Gillespie & Flitter, *Citi Investigated HR Complaints Against Wealth Head Sieg*, BLOOMBERG (Aug. 20, 2025),
*available at* https://www.bloomberg.com/news/articles/2025-08-20/citi-investigates-hr-complaints-against-wealth-
head-andy-sieg

instance, Carreon oversaw the largest conversion of managed investment accounts in United States banking history, after Wells Fargo acquired Wachovia.

29.    In 2021, Citi, unlike its peers in the financial services industry, did not employ a chief digital officer for its Private Bank offering, and the predictable result was a disjointed and disorganized digital experience for clients. In a quest to improve this vital function and catch up to industry standards, Citi hotly recruited Carreon to bring her expertise to Citi to transform the company's digital experience for a newly created Wealth management division that was part of Jane Fraser's core strategy when she was named CEO.

30.    Although Citi had earned a reputation as a male-centered, "boys club" firm, Carreon hoped to be at least somewhat insulated from that dynamic because she was recruited to work side by side with a woman named Deb Waters, the Chief Technology Officer ("CTO") for Citi Wealth. Citi made clear to Carreon that if she joined Citi, together with Waters she would embark on an ambitious project that would completely transform Citi's digital client experience. Specifically, through horizontal integration and transformation, Citi's individual lines of business—which until then were each siloed and thus highly disjointed—would begin working together to ensure the client experience was consistent and cohesive going forward.

31.    Enticed by the prospect of working on such a large and important project with Waters, Carreon accepted Citi's offer of employment in August 2021 to become the Program Function Group Head, a managing director position.

32.    Carreon hit the ground running, recruiting outside talent and developing strategic plans to achieve the digital transformation that Citi hired her to complete. Unsurprisingly, some Citi "lifers" who had spent their careers as siloed and autonomous Chief Operating Officers ("COOs") were reluctant to embrace the change at the center of Carreon's transformation.

33.    But Carreon was taken aback by the visceral negative reaction that some employees had to her, as a woman of color, implementing those changes. When the change Carreon brought to streamline Citi's operations inevitably ruffled the feathers of the mostly white and all-male group of COOs, Citi's pervasive sexist culture allowed these men to denigrate and harass Carreon without any fear of consequences.

34.    For example, one COO, a white man, demonstrated open hostility toward Carreon, and would yell at her during meetings about his opposition to the transformation. He treated her with disrespect and contempt, refusing to acknowledge her when she asked him a question, and instead communicating his answers to COO of Citi Wealth Valentin Valderrabano.

35.    This man had a history at Citi of drawing complaints for bullying, but Citi had not taken any action against him. Nor did any Citi executive come to Carreon's defense when the man and the other male COOs mistreated her.

36.    Carreon's supervisor, Eduardo Campos Martinez, consistent with Citi's long history of hostility toward women, failed to provide institutional support for her work, and instead would joke during their meetings about how she was "pissing people off."

37.    Men involved in the digital transformation did not face similar hostility and disrespect. For example, one of Carreon's peers, Mike Nardis, a white man who was Head of Planning, Change, and Execution, worked on the digital transformation but was not targeted by the COOs.

38.    Carreon's situation went from bad to worse when, mere months after she joined Citi, Citi displaced Waters and replaced her with the new CTO, Japan Mehta, a South Asian man. Mehta made clear that he was threatened by Carreon and that he did not want a strong,

capable woman involved in Citi's digital transformation, even though she had just been recruited and hired for that exact task.

39.     In November 2021, Carreon received an angry call from Mehta late on a Friday night. He told her that Citi had made a mistake hiring her, and that she was not needed and should leave the company. Mehta also told Carreon that she should stop working on the transformation.

40.     Bewildered by this treatment from Mehta—to whom Carreon did not report— Carreon called her supervisor, Martinez, and asked how she should proceed. To Carreon's shock and dismay, Martinez responded that Jim O'Donnell, then the CEO of Citi Wealth, had already discussed the matter with Mehta and had agreed with him that her role in the transformation should be minimized. Martinez told Carreon that Mehta would be overseeing the digital transformation without her, and that she should not "rock the boat" by trying to do the work that Citi had hired her to complete.

41.     Mehta ensured Carreon's non-participation by banning her from applicable meetings and keeping her off important communications. Carreon, now utterly sidelined from the very work she had excelled at for her entire career, was told by her supervisor to "find something to do."

42.     Even though Mehta, with O'Donnell's support, sidelined Carreon from her primary responsibilities, Carreon continued to find ways to add value to Citi. She sought to tackle other deficiencies she identified, such as repeatedly raising concerns with senior leadership about the lack of governance on Citi Wealth's tech book work, which exceeded $1.4 billion in the ensuing two years after she spoke out. Consistent with its pattern of ignoring the expertise of women, and especially women of color, Citi did not take up Carreon's

recommendations, to its own detriment. Unsurprisingly, by 2024, the financial periodical *Barron's* reported that the Wealth technical governance was deeply deficient by industry standards, precisely the concern Carreon identified but Citi refused to let her remedy.

43.    Despite diligently trying her best to find projects where she could add value for Citi, in or around June 2022, Campos mocked Carreon in a 1:1 meeting, saying "you don't work," or words to that effect. She responded with a list of accomplishments via email that he never acknowledged, consistent with Citi's culture where women are routinely subjected to disparaging remarks, minimization of their contributions, and differential treatment in professional settings.

### *Carreon Remains Sidelined for Two Years Until Sieg Joins Citi, But His Initial Support of Carreon Quickly Transforms into Sexual Harassment*

44.    Resilient in the face of being sidelined from the digital transformation, Carreon volunteered to run a different major global initiative, Citi's "T+1 Conversion." The initiative involved ensuring that Citi accounts could settle within 24 hours—down from the then-current time limit of three days. Carreon successfully managed teams across the world and rolled out the project without any defects.

45.    Word of Carreon's capable leadership and highly effective program management reached Andy Sieg, who in March 2023 was announced as the replacement for O'Donnell as Head of Citi Wealth.

46.    Sieg officially started in his new role in October 2023, and soon after scheduled a meeting with Carreon. Sieg immediately showered Carreon with praise, telling her that he heard she was a "rockstar" and that she had been mistreated by Mehta. Sieg promised Carreon that he would find a new role for her.

47.     Given how Citi had condoned other men harassing and disparaging Carreon since she joined, Sieg's warmth and charm was surprising. Finally, after being sidelined for two years, and having to make the most of her situation by volunteering to tackle other projects, it seemed to Carreon that she might now get back to the digital transformation work on which she had built her sterling reputation.

48.     Carreon's new supervisor, Valentin Valderrabano, who had failed to support Carreon and even told her that he was "not sure what you're good at," or words to that effect, suddenly promoted Carreon in December 2023 to become Citi's Global Head of Platform & Experiences.

49.     Based on her experience at Citi, Carreon understands that Sieg was behind the promotion. Having been in rooms where promotions were discussed, Carreon was aware that promotions at Citi require strong advocacy from higher-ups, who are overwhelmingly and disproportionately men.

50.     She also knew from experience with Valderrabano that he was at best uninterested, and at times actively hostile, toward her career. Indeed, Valderrabano so overtly favored men over women, and especially Carreon, that one of Carreon's male subordinates complained to her about it. As another example, on one occasion, Valderrabano instructed Carreon to leave Ida Liu (an Asian woman), head of the Private Bank, off an important communication.

51.     Upon Carreon's promotion in or around December 2023, she was expressly advised that Citi would approve additional headcount to support her expanded responsibilities. Like other assurances, this turned out to be a mirage. By early 2024, Valderrabano reversed this commitment and informed Carreon that no additional resources would be made available. By

contrast, Carreon's successor, Eric Lordi, a white man, was given multiple requisitions to hire Managing Directors and Directors.

52.    And despite the promotion, Carreon was still subjected to the same discriminatory culture as many women at Citi before her. Having reached the glass ceiling Citi imposed on women, and especially women of color, Carreon would be drummed out of the firm by the Citi's discriminatory and sexually harassing culture, aided by the same weaponized HR department.

53.    Ultimately, Sieg's limited professional support for Carreon came at a price too steep for her to bear—he spurred on a campaign of unrelenting and egregious sexual harassment, manipulation, and grooming.

54.    In Citi's discriminatory culture, women are viewed as less competent and unworthy, and are viewed with suspicion when they reach high levels of power, often assumed to be there because of men's sexual attraction to them.

55.    Sieg stoked the flames of this innuendo about Carreon, repeatedly intimating in public settings that he and Carreon had an intimate relationship.

56.    With the help of HR and Citi's discriminatory and sexually harassing culture, Sieg poisoned Carreon's reputation within Citi and ultimately forced her to leave the firm.

57.    After Carreon's promotion, Sieg told her to come directly to him with any matters, bypassing the reporting line that existed between her and Valderrabano. The direct access to Sieg became increasingly uncomfortable for Carreon. Valderrabano would make jokes about how he had no control over his own direct report, which put Carreon in an awkward position of having to manage Sieg's and Valderrabano's expectations simultaneously.

58.    Similarly, when Valderrabano refused to help Carreon overcome obstruction from David Poole, Head of Citigold and a subordinate of Sieg's, Carreon reported Poole's obstruction

to Sieg. Sieg eventually told her that he "manned up" and told Poole that "any request from you [Carreon] was from me [Sieg]," or words to that effect.

59.    Sieg communicated to Carreon constantly that she had "full access" to him, or words to that effect, both orally and in writing via email and Microsoft Teams messages.

60.    Sieg treated Carreon much differently from her male peers. He called her and texted her multiple times a week and made her believe that she was his confidant, telling her highly confidential information because, he said, there was no one else he could talk to. He also talked with sexual undertones, for example, calling her at night and telling her that when he was talking about her to other executives, he was "glazing her so hard that it made him feel dirty," or words to that effect.

61.    In another interaction, to conceal his correspondence with Carreon from prying eyes, he texted Carreon from an unknown number, and when she asked who it was, he responded, "It's Andy Sieg, silly. From my burner" (or words to that effect).

62.    Between December 2023 and mid-May 2024, Sieg contacted Carreon so often than an executive assistant remarked that he was "more attentive than a boyfriend," or words to that effect.

63.    Beyond this private grooming and harassment, Sieg began to poison her reputation at Citi by strongly insinuating in front of others that the two were intimate.

64.    This impression that Sieg worked so hard to foster was par for the course in Citi's discriminatory and sexually harassing culture, where the rare women who approached the inner circle of executives were presumed to have reached those positions through inappropriate sexual relationships with male executives.

65.     Given Citi's history of discrimination and harassment, Sieg's misimpression easily took root in the minds of Carreon's colleagues. Carreon was inundated with comments almost daily throughout Sieg's tenure like "Andy loves you" and "Andy favors you." One of Sieg's direct reports even told Carreon that Sieg "looks at you like he needs to get a room," or words to that effect.

66.     In December 2023, Sieg invited Carreon to a holiday dinner, and when she showed up, she realized that she was the only guest at the dinner who did not directly report to Sieg. Sieg had Carreon sit directly across from him, and during the dinner he announced to the crowd that Carreon was his "special guest."

67.     Indeed, Sieg commonly insisted that Carreon sit immediately next to him to cultivate a public impression that they were inappropriately close. In meetings, in a large meeting space Sieg frequently used, when Carreon arrived, he would pat an empty chair next to him and gesture for Carreon to sit next to him, which, because he was her boss's boss, she would. Sieg would then move his chair to be physically closer to Carreon in full view of Carreon's peers and higher-level executives at the Firm. Sieg's repeated insistence on being physically close to Carreon was, by Sieg's design, extremely suspicious to observers for several reasons. First, she was not one of his direct reports, and it made little business sense for her to have such close physical proximity to him. Second, other executives told Carreon that when she was not present in the meetings, Sieg sat conspicuously alone.

68.     Around February or March 2024, Sieg held a meeting with Carreon and two male Citi Ventures executives, Luis Valdich and Arvind Purushotham, and during the meeting he said that he and Carreon had a "secret song" together—"Comeback Story" by Kings of Leon. The

room fell silent, and the two men were clearly uncomfortable. Sieg strongly and intentionally implied to these professional colleagues of Carreon's that he and Carreon shared intimate secrets.

69.    Around March 2024, Sieg, Carreon, Valderrabano, and Emily Shelton attended a meeting that was going late into the evening. Carreon told Sieg that she needed to leave to attend a planned dinner, and Sieg responded, in front of others, that he was disappointed she was leaving because he was "home alone" and "would be left eating pizza home alone," or words to that effect. Carreon left, extremely humiliated that Sieg had signaled in front of others that he was hoping to have dinner with her.

70.    When Carreon discussed the incident with a female colleague, the colleague told Carreon, "Julia, you realize you're being groomed, right?"

***Citi's Weaponized Human Resources Department Conducts a Deeply Misogynistic Investigation that Irreparably Harms Carreon's Reputation***

71.    In or around the Spring of 2024, Carreon noticed that Sieg's harassment began to intensify. For example, around February 2024, Sieg belittled her in front of others during a meeting by stating that she "makes a lot of glaringly obvious statements that aren't very profound," or words to that effect. Later, during Sieg's commute home, he called her and explained that he was taking Carreon "down a notch today" because "so many people in the company think I'm your bitch" (or words to that effect) based on the distorted public image of their relationship that he had carefully cultivated and Citi had condoned.

72.    By April 2024, office gossip about an inappropriate relationship between Carreon and Sieg had become so intense that Carreon was forced to ask Sieg to stop talking about her in town hall meetings or mentioning her name in large groups. She told Sieg that her colleagues' perception of her relationship with Sieg was impeding her ability to perform her job. Sieg

laughed at her, telling her that she was "paranoid," and that he could do "whatever he wanted," or words to that effect.

73.    Carreon had hit the glass ceiling at Citi, and Citi's discriminatory machinery began the process of pushing her out of the firm.

74.    In mid-May 2024, Sieg abruptly ceased all communication with Carreon.

75.    Around the same time, in May 2024, Carreon learned that for several months, Human Resources ("HR") had been investigating her for two separate, baseless allegations—both of which were consistent with HR's role in perpetuating Citi's decades-long history of bias and harassment against women, and both of which involved Carreon being blamed for men's wrongdoing.

76.    The first allegation was that she was a bully and "coming on too hard," or words to that effect. Citi provided an example of an interaction she had with the white male COO, whom Citi had laid off several months prior.

77.    In a bitter but unsurprising irony, Citi's weaponized HR department deemed the man a credible witness of Carreon's alleged bullying, even though he was the subject of bullying complaints, had publicly demeaned and bullied Carreon, and had now apparently complained about her on his way out of the company.

78.    Moreover, Carreon was clearly being subjected to Citi's discriminatory double standard, in which men like the white male COO who had been hostile to Carreon are expected to be tough leaders, and women like Carreon are tasked with orchestrating transformational change that will upset the status quo for many, then formally investigated as bullies for coming across "hard."

79.     This double standard was commonplace at Citi. Carreon had previously participated in a managing review meeting, which included HR, to discuss the potential promotion of a white male director at Citi who was a known bully. Carreon advocated that Citi promote a talented woman, but the men in the meeting penalized the woman for being too competent, insisting in sexist terms that because she was so talented she was "scary," "intimidating," and "knew her numbers too well." Ultimately, the man was promoted instead of the woman, who was later laid off.

80.     The "bullying" investigation was tailor made to humiliate Carreon and exacerbate the hostile work environment she faced. HR investigators conducted a humiliating interview with Carreon on the same day that she was being celebrated by the financial industry with her picture in Times Square.

81.     At one point during the investigation, Citi asked Carreon whether she was "indiscreet" or "a gossip," clearly sexist language implying that she did not fit Citi's stereotypes of a quiet, compliant woman.

82.     Meanwhile, Carreon gave HR a list of individuals who could attest to her character and counter the false narrative that she was a bully. Though their statements would be relevant to any good-faith investigation, HR never reached out to any of them.

83.     The second allegation against Carreon was that she had gotten ahead at Citi because she had special access to Sieg. The HR investigators subjected Carreon to a two-hour interrogation about this allegation. More inquisitorial than investigative in tenor, the HR representatives posed questions as predetermined conclusions, leaving Carreon with the clear and unmistakable impression that HR had prejudged the outcome.

84.     HR asked her whether she thought it was "appropriate" for her to have access to senior executives. The question was offensive and nonsensical; her peers, like Nardis, regularly met with Sieg, but such access was unquestioned at Citi because they were men. Similarly, her male peers' success at Citi was not presumed to be the result of a sexual relationship with a superior. At Citi, however, women with close access to executives were presumed to have access not due to talent or competence, but because of their sexual appeal to men.

85.     The investigators also asked Carreon whether she "got to travel because Andy liked you," or words to that effect, to which Carreon responded that her travel budget was negotiated as part of her contract. The investigators could have learned as much by simply reviewing Carreon's employment file, but yet again, Citi relied on sexist assumptions that Carreon's work privileges—for which men were not investigated—must be the result of her sexual relationship with a man.

86.     The investigators also trapped Carreon with questions about whether she had gleaned confidential information from Sieg, and whether she had leaked information to the press. In May 2024, likely after Sieg already knew that the gears were in motion against Carreon, Sieg expressly asked Carreon to take the bizarre and compromising step of leaking information on his behalf to Hayley Cucinello, a reporter at *Business Insider*, that would paint him in a good light in advance of the reporter's story about him. Carreon understood Citi's policy against leaking such information, but she complied with her boss's boss's demand. Even though Sieg had chosen to divulge confidential information, and asked Carreon to leak that information on his behalf, Carreon was the one being investigated.

87.     Indeed, Carreon suspects that Sieg was funneling to HR distorted stories about the information he improperly disclosed to her. Sieg, for instance, had gossiped to Carreon, beyond

the scope of any business need, and purely to cultivate his sexually harassing relationship with her, that a member of Citi's C-Suite was being exited from Citi. Carreon kept it in the strictest confidence and told no one. Yet during the investigation, HR asked her whether she had "bragged" to others at Citi headquarters about her knowledge of the executive's exit. Because Carreon had not told anyone else, Carreon suspects that Sieg likely told HR that Carreon knew.

88.    Finally, when the investigators asked Carreon if she was having an inappropriate relationship with Sieg, she said that she was not, and she asked what Sieg had said when the investigators brought the same question to him. But the investigators responded that only Carreon—not Sieg—was under investigation.

89.    Thus, consistent with its long history of discrimination and sexual harassment, Citi HR, purportedly believing there to be a sexual relationship between a female subordinate and a male executive with the power to fire her, chose only to investigate the woman, after Sieg had sexually harassed her for months on end, and Citi had condoned a sexually harassing culture.

90.    Similar abuses by Citi's HR department have been alleged in *Lindsey v. Citigroup Global Markets Inc.*, No. 1:23-cv-10166, Am. Compl., Dkt. 12 (S.D.N.Y. Apr. 22, 2024). In that action, another female executive alleges that Citi, including its HR department, "repeatedly protected, and covered up for, the male executives who discriminated against and harassed" women. (*Id.* ¶ 2.)

91.    Between Sieg's public and sexually charged conduct toward her, and word spreading about the investigation—Carreon learned from HR that they had talked to dozens of employees about the allegations—it became a widespread rumor that Carreon was having sex with Sieg. Indeed, Carreon later heard from an analyst at Citi several levels below Carreon, that her "entire floor" knew about the investigation and thought she was having an affair with Sieg.

92.    Carreon was left distraught—Citi was destroying her reputation, which she had cultivated for years in the industry, and was trying to reduce her to a sex object, capable of advancement only through sleeping with high-powered men.

93.    When she heard the "entire floor" believed she was having sex with Sieg, Carreon left the office and vomited, and she was unable to sleep.

94.    The next day she called her supervisor, Valderrabano, and begged him to intervene to stop the defamatory investigation about the alleged sexual relationship. Valderrabano refused, telling her that at Citi, it was a "rite of passage to be investigated for having an affair," or words to that effect.

95.    The same day, Carreon contacted her HR business partner, Stephanie Butterworth. In painstaking detail, Carreon outlined the misogynistic nature of the investigation and asked if there were even small steps HR could take to mitigate the damage it was causing to her reputation. For example, Citi was gratuitously notifying colleagues of the investigation by asking them about irrelevant and minor details like Carreon's travel schedule, which could have been resolved without notifying others that Carreon was under investigation. Butterworth did nothing to assist Carreon, who was visibly in distress.

***Citi Unlawfully Forces Carreon to Resign***

96.    Carreon endured mistreatment at Citi for several years. She endured being belittled and humiliated by disgruntled male COOs. She endured being sidelined by Mehta and denied the opportunity to do the work that she specializes in. She endured being humiliated by Campos and Valderrabano who routinely "joked" that her skillset was of no value to Citi. She endured being sexually harassed by Sieg for months. She endured a biased and misogynistic investigation by HR in which *she*, rather than the abusive men, was targeted and blamed. She

20

endured the pervasive presumption that she had achieved success through sex, rather than through talent.

97.    Carreon understood from experience that HR would circle the wagons to protect the men of Citi. After the debacle where the almost all-male fraternity of Managing Directors chose to promote the male bully over the competent and therefore "scary" woman, Carreon could no longer keep her head down and quietly tolerate the pervasive sexist and harassing culture she had experienced throughout her tenure at Citi.

98.    In or around October 2023, Carreon complained to a respected Asian female executive about the racist and sexist double-standards at Citi, from a white male COO publicly calling a female peer a "fucking moron," or words to that effect, without correction; to Valderrabano refusing to take Carreon's ideas seriously until he heard them repeated by a more junior male employee; to a man earning a promotion when his bullying was treated as strong leadership and a woman being denied promotion for being too competent and therefore "scary."

99.    Carreon told the executive that five witnesses would attest to these issues and understood that the woman took her concerns to HR. Yet Carreon not only received no relief from HR, but HR also never contacted her or any of the witnesses she listed about the incident.

100.    Carreon had witnessed her mother suffer domestic violence, and she had promised herself that she was not going to let men abuse her, too. Staying any longer at Citi meant suffering further mistreatment by Citi's weaponized HR department and suffering further humiliation as innuendo and rumors that she was sleeping with her boss discredited her and tarnished her reputation.

101.    Carreon had also disclosed to Sieg that this investigation had for the first time in her adult life triggered post-traumatic stress from her childhood; yet Sieg did nothing to

intervene on Carreon's behalf despite it being well-understood he involved himself in other HR situations, such as a matter involving Don Plaus.

102.    In any event, Citi's months-long investigation into her conduct—ignoring the real harms of men's misconduct—emphasized that Citi was going to push her out, one way or another, like so many before her.

103.    Citi's takedown was successful. Left with no other sensible recourse, and despite the significant financial stress it would cause her family given that she was the primary earner, Carreon was forced to leave Citi in or around June 2024.

104.    Because of Defendants' unlawful conduct, Plaintiff has lost substantial income, suffered emotional distress, and her career and reputation have been irreparably harmed, among other losses. Plaintiff has thus far struggled to obtain new employment, and has had to hire an executive recruiter, at substantial cost.

105.    Defendants' unlawful conduct was intentional and in blatant disregard of Plaintiff's legal and civil rights and warrants imposition of punitive damages.

## COUNT I

### RACE AND SEX DISCRIMINATION IN VIOLATION OF
### NEW YORK STATE HUMAN RIGHTS LAW

106.    Plaintiff realleges each and every paragraph above and incorporates them by reference as though fully stated herein.

107.    The New York State Human Rights Law ("NYSHRL") establishes that it is unlawful, because of an individual's race or sex, "to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment," N.Y. Exec. Law § 296(1)(a).

108.    NYSHRL further forbids employers to "subject any individual to harassment because of race … [or] sex … regardless of whether such harassment would be considered severe or pervasive under precedent applied to harassment claims. Such harassment is an unlawful discriminatory practice when it subjects an individual to inferior terms, conditions or privileges of employment because of the individual's membership in one or more of these protected categories." N.Y. Exec. Law § 296(1)(h).

109.    By their conduct alleged herein, Defendants unlawfully discriminated against Plaintiff, under both disparate treatment and disparate impact theories of liability.

110.    By their conduct alleged herein, Defendants unlawfully subjected Plaintiff to sexual harassment and a sexually hostile work environment.

111.    Plaintiff has suffered damages as a result of Defendants' violation of the NYSHRL.

## COUNT II

### RACE AND SEX DISCRIMINATION IN VIOLATION OF NEW YORK CITY HUMAN RIGHTS LAW

112.    Plaintiff realleges each and every paragraph above and incorporates them by reference as though fully stated herein.

113.    The New York City Human Rights Law ("NYCHRL") establishes that it is unlawful, because of an individual's race or sex, "to bar or to discharge from employment such person," or to "discriminate against such person in compensation or in terms, conditions or privileges of employment." NYC Admin Code § 8-107(1)(a)((3).

114.    By their conduct alleged herein, Defendants unlawfully discriminated against Plaintiff, including by subjecting her to a sexually hostile work environment and sexual harassment, under both disparate treatment and disparate impact theories of liability.

115.    Plaintiff has suffered damages as a result of Defendants' violation of the NYCHRL.

## COUNT III

### RACE DISCRIMINATION IN VIOLATION OF
### 42  U.S.C. § 1981

116.    Plaintiff realleges each and every paragraph above and incorporates them by reference as though fully stated herein.

117.    Under 42 U.S.C. § 1981, as amended, people of all races are guaranteed the same right to make and enforce contracts, regardless of race. The term "make and enforce" contracts includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

118.    By the acts and conduct described above, Defendants engaged in illegal intentional racial discrimination against Plaintiff in violation of 42 U.S.C. § 1981.

119.    Plaintiff has been harmed as a direct and proximate result of Defendants' unlawful conduct.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests the entry of judgment in her favor and against Defendants as follows:

a.    Declare that the acts and conduct of Defendants are unlawful and violate 42 U.S.C. § 1981, the NYSHRL, and the NYCHRL;

b.    Award Plaintiff the value of all compensation and benefits lost as a result of Defendants' unlawful conduct;

c.    Order Plaintiff reinstated to her appropriate position, promotion and seniority, and otherwise make Plaintiff whole;

24

d.      Award Plaintiff the value of all compensation and benefits she will lose in the future as a result of Defendants' unlawful conduct;

e.      Award Plaintiff compensatory damages, including but not limited to damages for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses;

f.      Award Plaintiff punitive damages due to Defendants' malicious conduct and/or their reckless or callous indifference to the statutorily protected rights of Plaintiff;

g.      Award Plaintiff prejudgment interest;

h.      Award Plaintiff attorneys fees, costs, and disbursements; and

i.      Award Plaintiff such other make whole equitable, injunctive, and legal relief as this Court deems just and proper.

Plaintiff hereby demands a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

Date: January 26, 2026

Respectfully submitted on behalf of Plaintiff,

By:     */s/ Shona B. Glink*
        Linda D. Friedman (*pro hac vice motion for lead Counsel forthcoming*)
        Shona B. Glink (No.4051280)
        STOWELL & FRIEDMAN LTD.
        303 W. Madison, Suite 2600
        Chicago, Illinois 60606
        Phone: (312) 431-0888